**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| MARK SCHNEIDER, on behalf of<br>himself and all others similarly situated, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 1:18-CV-00402-LO-IDD |
| | ) | |
| METROPOLITAN WASHINGTON | ) | JURY TRIAL DEMANDED |
| AIRPORTS AUTHORITY | ) | |
| 1 Aviation Circle | ) | |
| Washington, DC 20001, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**FIRST AMENDED CLASS ACTION COMPLAINT**

Plaintiff Mark Schneider, on behalf of himself and all others similarly situated, complains

as follows against defendant Metropolitan Washington Airports Authority ("Authority"):

**I.    OVERVIEW OF THE ACTION**

1.     This is a class action against the Authority.   Plaintiff seeks monetary and

declaratory relief for the Authority's establishment, charging,   and   collection of

unconstitutionally excessive tolls in violation of the Fourteenth Amendment of the United States

Constitution and 42 U.S.C. § 1983.

2.     The Authority is an interstate compact and "public body corporate and politic and

independent of all other bodies," Va. Code § 5.1-153, created for the purpose of "acquiring,

operating, maintaining, developing, promoting and protecting Ronald Reagan Washington

National Airport and Washington Dulles International Airport."  Va. Code § 5.1-156.

3.     Pursuant to a 2006 agreement between the Authority and the Commonwealth of

Virginia's Department of Transportation ("VDOT"), the Authority has, for a 50-year period, the

exclusive right to establish, charge, and collect tolls and other user fees for all vehicles using the Dulles Toll Road ("Toll Road").

4.      The Toll Road is a heavily traveled 8-lane, 14-mile toll public road extending between the Capital Beltway and the Dulles Greenway in northern Virginia.  In 2008, VDOT transferred to the Authority the daily operation, maintenance, and control of the Toll Road.

5.      Under the 2006 agreement's terms, VDOT conferred toll servicing rights on the Authority in exchange for the Authority's agreement to finance the Commonwealth's share of the Dulles Corridor Metrorail Project ("the Project"), a two-phase expansion of the Metrorail to Dulles Airport.

6.      Neither VDOT nor any other governmental body supervises, or even has the right to supervise, the Authority or its toll servicing rights.  This is in contrast to other toll road operators in Virginia, which are subject to oversight by the State Corporation Commission.  By statute, other toll road operators must set tolls, subject to the Commission's approval, "at a level which is reasonable to the user in relation to the benefit obtained and which will not materially discourage use of the roadway by the public and which will provide the operator no more than a reasonable return as determined by the Commission."  Va. Code § 56-542(D).

7.      As a result of this arrangement, users of the Toll Road have been required to pay hundreds of millions of dollars in excessive tolls.  The Authority purposely sets tolls at levels far above the revenue needed for the Toll Road's operation, maintenance, improvement, and debt retirement.  A substantial portion of toll revenues collected are instead earmarked for the Project. For their part, however, actual Metrorail passengers bear *none* of the costs of the Metrorail expansion.

8.     Since assuming Toll Road operations, the Authority has repeatedly hiked tolls for the sole stated purpose of funding the Metrorail expansion.  The Authority forecasts substantial future hikes linked to the Project's costs.

9.     This arrangement is unconstitutional.  The right to travel on the Toll Road is one granted by the United States Constitution, which protects the fundamental right to intrastate travel through public spaces and roadways.  After all, "the right to remove from one place to another according to inclination, is an attribute of personal liberty, and the right, ordinarily, of free transit from or through the territory of any state is a right secured by the 14th Amendment and by other provisions of the Constitution." *Williams v. Fears*, 179 U.S. 270, 274 (1900).

10.     Public bodies like the Authority "may not impose a charge for the enjoyment of a right granted by the federal constitution," *Murdock v. Pennsylvania*, 319 U.S. 105, 113 (1943), except as necessary to "meet the expense incident to the administration of the act and to the maintenance of public order in the matter licensed."  *Cox v. New Hampshire*, 312 U.S. 569, 577 (1941).  Public bodies may not single out protected conduct for fees used, in whole or in part, to fund programs that are "unrelated to the scope of the activities" of those who pay the fees. *Murdock*, 319 U.S. at 113.  When a fee outgrows its cost-recovery purposes, it becomes "a revenue tax" on, *Cox*, 312 U.S. at 577, or, worse, effort "to control or suppress," *Murdock*, 319 U.S. at 112, enjoyment of the constitutional right.

11.     The Supreme Court's fee jurisprudence fits comfortably in the context of the right to travel.  Generally, fees (like tolls) designed to offset the cost of maintaining state-provided facilities are permissible if they "reflect a uniform, fair and practical standard relating to public expenditures," *Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.*, 405 U.S. 707,

716 (1972), but violate the right to travel unless they are based on some "fair approximation" of use of the facilities or are not excessive in relation to the benefits conferred. *See id.* at 716-17.

12.     The Authority violates these tenets by unconstitutionally establishing, charging, and collecting tolls designed not only to recoup the costs of the Toll Road's operation, maintenance, improvement, and debt retirement – costs that are reasonably attributable to tollpayers' use of the Toll Road – but also to subsidize the Project – costs that are neither reasonably attributable to tollpayers' use of the Toll Road nor fairly shared by Metrorail passengers, the Project's primary beneficiaries.

## II.     JURISDICTION AND VENUE

13.     Federal jurisdiction is proper under 28 U.S.C. §§ 1331 and 1343, as this lawsuit arises under the laws of the United States, including 42 U.S.C. § 1983.

14.     Venue in this judicial district is proper under 28 U.S.C. § 1391 because the Authority resides here, the Toll Road is located here, and this judicial district is where a substantial part of the events or omissions giving rise to the claim occurred.

## III.    PARTIES

### A.     Defendant Metropolitan Washington Airports Authority

15.     The Authority is the product of a unique interstate compact.  In 1985, Virginia and the District of Columbia separately passed compact-legislation authorizing the Authority's establishment.  A year later, Congress passed the Metropolitan Washington Airports Act of 1986 ("Transfer Act"), 49 U.S.C. § 49101 *et seq.*, approving the compact-legislation.

16.     The Authority is governed by an unelected board of directors consisting of thirteen members: five members appointed by the Governor of Virginia, three members appointed by the Mayor of the District of Columbia, two members appointed by the Governor of

Maryland, and three members appointed by the President of the United States with the advice and consent of the Senate. 49 U.S.C. § 49106(c); *see also* Va. Code § 5.1-155.

17.     On June 7, 1987, Dulles Airport and what is now Reagan National Airport were transferred to the Authority under a 50-year lease authorized by the Transfer Act. All property was transferred to the Authority; the federal government holds title to the lease. On June 17, 2003, the lease was extended 30 years to June 6, 2067.

18.     On this basis, the Authority operates a two-airport system – Dulles and Reagan National – that provides domestic and international air service for the mid-Atlantic region. The Authority consists of more than 1,400 employees in a structure that includes central administration, airports management and operations, and fire and police departments. (The Authority, however, is *not* part of the Washington Metropolitan Area Transit Authority, which manages the Metrorail system in the national capital area.)

19.     The Authority is not taxpayer-funded but is self-supporting, using aircraft landing fees, rents, and revenues from concessions to fund operating expenses. It is "a public body corporate and politic with the powers and jurisdiction conferred upon it jointly by the legislative authority of Virginia and the District of Columbia," concurred in by the legislative authority of the other jurisdiction. 49 U.S.C. § 49106(a); Va. Code § 5.1-153.

20.     Under its organic statutes, the Authority is "independent of Virginia and its local governments, the District of Columbia, and the United States Government" and is "a political subdivision constituted only to operate and improve the Metropolitan Washington Airports as primary airports serving the Metropolitan Washington area." 49 U.S.C. § 49106(a); *see also* Va. Code §§ 5.1-153, 5.1-156(B) (the Authority is "independent of the Commonwealth and its local political subdivisions").

21.     The Authority is statutorily authorized to "fix, revise, charge, and collect rates, fees, rentals and other charges for the use of the airports." Va. Code § 5.1-156(A)(8); *see also* 49 U.S.C. § 49106(b)(1)(E) (authorizing the Authority "to levy fees and other charges"). That authorization, however, does not (and obviously cannot) permit the Authority to collect tolls on the Toll Road in a manner or amount that violates the Constitution.

22.     The Authority is statutorily authorized to sue and be sued in its own name. Va. Code § 5.1-156(A)(11).

**B.     Plaintiff Mark Schneider**

23.     Plaintiff Mark Schneider is a citizen of Virginia, and resides in this judicial district.

24.     Plaintiff has repeatedly used and paid tolls on the Toll Road, and has done so within the past several years. In most months, plaintiff uses the Toll Road several times per week. Plaintiff intends to continue using and paying tolls on the Toll Road within the foreseeable future.

25.     Plaintiff prefers the Toll Road to lower grade local roadways when traveling across northern Fairfax County into Loudoun County because the Toll Road provides higher legal speed limits and an unimpeded flow of traffic, with no traffic signals, intersections, or property access.

**IV.     FACTUAL ALLEGATIONS**

**A.     The Dulles Toll Road**

26.     In 1983, the United States government, acting by and through the Federal Aviation Administration, granted a deed of easement to the Commonwealth of Virginia for the construction, operation, and maintenance for a term of 99 years of a limited access highway to be

known as the "Dulles Toll Road."[1]   The land beneath the Toll Road is owned by the United

States government and leased until 2067 to the Authority as part of Dulles Airport.

27.     The Toll Road was built in 1984 by VDOT to provide local access to interchanges

between the Capital Beltway (Interstate 495) and Dulles Airport.  It is one segment of Virginia

State Route 267, the two other segments being the Dulles Airport Access Highway and the

Dulles Greenway.

28.     The Dulles Greenway is a privately owned and operated toll road that commences

at the Toll Road's western terminus.   The Greenway is operated by Toll Road Investors

Partnership II (TRIP II), which is in turn owned by Macquarie Atlas Roads.

29.     The Dulles Airport Access Highway is a free road for airport business only that

runs parallel to a portion of the Toll Road with access to Dulles Airport.  It is illegal to use the

Access Highway for non-airport business; unlawful use of the Access Highway is punishable by

civil penalties.  The Toll Road is, in effect, the Access Highway's twin, built to serve the distinct

needs of motorists *not* traveling to Dulles Airport to preserve the Access Highway's exclusive

role as the artery to the airport.  The critical difference between the two is that motorists on the

Access Highway pay no toll.

30.     Situated almost entirely in northern Fairfax County, Virginia, the Toll Road

begins just inside the Capital Beltway near West Falls Church at a connector to Interstate 66,

travels westward through Fairfax County past Dulles Airport, and terminates at the entrance to

the Dulles Greenway just inside Loudoun County, Virginia.

31.     The Toll Road is the only commuting expressway connecting northern Fairfax

County to the Capital Beltway.  As such, it is a well-traveled route.  During 2016, for example,

---

[1] Officially, the Toll Road is named the "Omer L. Hirst – Adelard L. Brault Expressway," in
honor of two Virginia state legislators.  However, it is rarely referred to by that name.

the Authority recorded 97,718,528 transactions on the Toll Road, a daily average of 267,722 transactions.   The Authority anticipates that, during 2018, the Toll Road will process approximately 98,838,400 transactions.

32.     The Toll Road has 25 full-service toll collection lanes, six exact-change collection lanes, and 28 E-ZPass-only collection lanes.   All tollbooths are equipped with E-ZPass, an electronic toll collection system accepted in 15 contiguous states, including most states in the Virginia-to-Maine corridor.

**B.     The Authority's Toll Servicing Rights**

33.     The Authority operates the Toll Road under a permit and operating agreement with VDOT dated December 29, 2006 ("Permit").   The Permit's stated purpose is to give the Authority the power to collect toll revenues to fund the Project.   The "Dulles Corridor" is defined as the transportation corridor with an eastern terminus of the East Falls Church Metrorail Station at Interstate Route 66 and a western terminus of Virginia Route 772 in Loudoun County, Virginia.

34.     The Project is to be completed in two phases.   Phase 1 of the Project extends 11.7 miles from near the West Falls Church station to Wiehle Avenue in Reston, Virginia.   It includes five new stations and improvements to the existing Metrorail service and inspection yard at the West Falls Church station.   Construction activities began in March 2009 and in July 2014 the Metrorail's "Silver Line" opened for passenger service.

35.     Phase 2 of the Project will extend the Metrorail system an additional 11.4 miles from Wiehle Avenue in Reston to Dulles Airport and into Loudoun County.   Phase 2 includes six new stations and a maintenance yard located on Dulles Airport property.   Construction for Phase

2 is planned through 2018.  The Metrorail expansion thus extends through the Dulles Corridor with stops both before and after Dulles Airport.

36.     Before the Authority undertook operations, the Toll Road was operated by the Commonwealth Transportation Board ("CTB"), a Virginia state agency.  In the years since the Toll Road opened, the Virginia General Assembly repeatedly authorized CTB to use toll revenue to fund mass transit projects within the Dulles Corridor.  In 1990, the General Assembly authorized CTB to use surplus revenue from the Toll Road to fund improvements, including mass transit projects.  In 1995, the General Assembly again authorized CTB to use surplus toll road revenue to fund mass transit improvements and to raise another $45 million by issuing new bonds.  In 2002, the General Assembly approved a CTB resolution providing that CTB would spend 85% of its surplus revenue from the Toll Road to fund "mass transportation initiatives in the Dulles Corridor."  Finally, in 2004, the General Assembly granted CTB open-ended authority to issue revenue bonds to fund, among other things, a mass transit rail project in the Dulles Corridor, to be paid with revenues from the Toll Road.  CTB then raised tolls for the first time in the Road's history, earmarking the additional money raised for extending the Metrorail system through the Dulles Corridor.

37.     The Commonwealth sought to allay the financial burden associated with the Metrorail expansion by receiving proposals to privatize the Toll Road.

38.     The Authority shared VDOT's goal of extending the Metrorail system to Dulles Airport.  Under the Transfer Act, the Authority was to "assume responsibility for the Federal Aviation Administration's Master Plans for the Metropolitan Washington Airports."  49 U.S.C. § 49104(a)(6).  Those master plans called for Metrorail's expansion to Dulles Airport.

39.     To fulfill this mandate, in 2005 the Authority announced a proposal to take control of the Metrorail expansion as well as the Toll Road, which was providing much of the revenue for the expansion.  As a result, all privatization proposals were rejected without allowing the firms an opportunity to respond to the Authority's plan with their own counteroffers.

40.     In its "Proposal to Operate the Dulles Toll Road and Build Rail to Loudoun County," updated in January 2006 ("Proposal"), the Authority stated that it "has always made access to the airport and construction of a rail transit line to Dulles one of its highest priorities." The Proposal concluded "that the greatest benefit to transit at the lowest overall cost will be obtained if the Airports Authority itself operates the Toll Road and commits all revenues in excess of operating costs to the construction of rail and other corridor improvements."

41.     The Authority proposed to VDOT that, among other things, it assume responsibility for "toll rate setting" for the Toll Road and "for the Commonwealth's remaining share of financing for both Phases I and II of the Dulles Metrorail expansion."  The Proposal stated that tolls on the Toll Road "are currently among the lowest in the world on a per-mile basis" and, if the Authority were granted toll-setting power, would be "increased from time-to-time as improvements require and to match inflation."  The Authority thus pitched its Proposal as providing capital "for the Dulles Corridor Metrorail Project as well as other significant improvements in the Dulles Corridor."  The Authority estimated that it would make "contributions" of $361 million in toll revenues for Phase I of the Project and $1.4 billion in toll revenues for Phase II.

42.     In short, the Authority's proposed deal would transfer complete control of the Toll Road including toll-setting power to the Authority in return for funding the Commonwealth's share of the Metrorail construction and operational costs.

43.     The Authority's Proposal was widely criticized at the time because its implementation would fail to protect Toll Road commuters from high tolls and confer unfettered authority to set tolls upon a politically unaccountable entity whose board is not even comprised by a majority of Virginia appointees.  For example, in the 2006 General Assembly Special Session on Transportation, delegates sponsored a bill prohibiting the sale or giving away of the Toll Road that passed the House of Delegates.  The governor, however, succeeded in blocking this measure in the Senate Transportation Committee.

44.     Ultimately, VDOT accepted the Authority's Proposal.  VDOT failed to consult with the General Assembly before giving away the Toll Road, a valuable state asset.

45.     The resulting Permit between VDOT and the Authority explains that its purpose is "to provide the Airports Authority a permit to operate the Toll Road and collect Toll Revenues in consideration for the Airports Authority's obligation to fund and cause to be constructed the Dulles Corridor Metrorail Project and other transportation improvements in the Dulles Corridor" in accordance with certain "Financial Projections" the Authority prepared.

46.     In the Permit, VDOT granted the Authority "the exclusive right to establish, charge and collect tolls and other User Fees for the use of the Toll Road from and after the Effective Date and until expiration of the Term or earlier termination of this Agreement," as specified elsewhere in the Permit.  In granting this right, VDOT and the Commonwealth abdicated any supervision of the Authority's toll-setting power.  Instead, "prior to increasing any toll rate," the Authority need only convene "one or more public hearings in the Dulles Corridor to ensure that members of the public and the parties to the local funding agreements, including Fairfax County and Loudoun County have the ability to be informed and express their views on any proposed toll increase."  These hearings are strictly advisory.

47.     Furthermore, while the Authority must also "consult with the Dulles Corridor Advisory Committee with respect to the frequency, timing and amount of any new toll rates," "no consent or approval of the Dulles Corridor Advisory Committee is required to be obtained by the Airports Authority with respect to establishing, increasing or otherwise changing any toll rates."   Under the Permit, the Authority thus retains unfettered discretion "with respect to the frequency, timing and amount of any new toll rates."

48.     The Permit's term is 50 years.   It may be terminated by the Authority or VDOT before the term's end only for specified non-compliance with certain of the Permit's terms.

49.     VDOT transferred the Toll Road's operation to the Authority in November 2008.

50.     All toll revenues collected "shall be the property of the Airports Authority to be retained, pledged, assigned and otherwise used by the Airports Authority without further approval of the Commonwealth, the Department [VDOT], or any other Person," except as a directed by the Permit and certain Toll Road financing documents.   Each year, the Authority must budget and use all toll revenues according to a cascading list of priorities: (i) operating and maintenance expenses for the Toll Road; (ii) debt service for the Toll Road; (iii) expenditures for a renewal and replacement program for the major elements of the Toll Road, such as bridges and toll plazas; (iv) costs of capital improvements not otherwise funded by revenue bonds; (v) capital costs of the Project; (vi) costs of "transit operations" in the Dulles Corridor; and (vii) all remaining revenues to be paid to the Commonwealth for allocation by the CTB for transportation programs and projects reasonably related to or benefit Toll Road users.

51.     The first toll increase in the Toll Road's history became effective in May 2005, while the Road remained under CTB's operation.   A second Authority-directed toll increase

became effective in January 2010, a third in January 2011, a fourth in January 2012, a fifth in January 2013, and a sixth in January 2014.

52.     The Authority has candidly explained that its toll increases are necessary for the Authority to fulfill its commitment to expand the Metrorail.   For example, in a 2012 public release answering the question "Why are the tolls increasing now?", the Authority answered:

> Several factors influence the timing and size of the proposed toll rate adjustments. The primary considerations are the annual debt service requirements on approximately $1.3 billion of Dulles Toll Road (DTR) revenue bonds that have already been issued, the potential debt service on bonds that will be issued over the next few years, the anticipated cash expenditures for improvements to the Dulles Toll Road and other infrastructure in the Dulles Corridor, and the desire to minimize year-to-year toll rate increases.

53.     From the time the Toll Road opened in 1984 to the first toll increase in 2005, tolls were set at 50 cents at the main toll plaza, 25 cents at ramp plazas, and 35 cents at the ramps to Sully Road and the Dulles Greenway.   In 2005, the Authority observed that the toll prices were among the lowest in the world on a per-mile basis.   That is no longer true.   For two-axle vehicles, tolls are $2.50 at the main toll plaza and $1.00 at the ramp plazas.   That is a 466 percent increase between 2005 and 2014.

54.     Since 2014, the toll has been $3.50 ($2.50 at the main toll plaza and $1 at on/off ramps) but tolls are expected to increase over the next 25 years.   In an October 2017 "Report to the Finance Committee: 2018 Draft Budget," the Authority forecast full-trip toll increases as follows:

- 2019 – $4.75
- 2023 – $6.00
- 2028 – $7.25
- 2033 – $8.75
- 2038 – $10.00
- 2043 – $11.25

55.     In 2016, the Authority's electronic toll collection revenues on the Toll Road were approximately $128,854,000; cash revenues were approximately $22,877,000.  During 2018, the Authority anticipates receiving approximately $135,522,000 in electronic toll collection revenues; it anticipates cash revenues of approximately $18,480,000.

56.     Unlike the Authority, private tollway operators are subject to the Virginia Highway Corporation Act of 1988, Va. Code § 56-535 *et seq.*  That Act requires the State Corporation Commission to regulate tolls "at a level which is reasonable to the user in relation to the benefit obtained and which will not materially discourage use of the roadway by the public and which will provide the operator no more than a reasonable return as determined by the Commission."  Va. Code § 56-542(D).  The Authority, however, is not required to submit to the State Corporation Commission's regulation, and can and does set tolls without regard to whether they are reasonable in relation to the Toll Road's operating costs or the benefits conferred.

57.     Revenue raised from farepaying Metrorail passengers will not finance any portion of the Metrorail expansion.  Under a 2007 Agreement to Fund the Capital Cost of Construction of Metrorail in the Dulles Corridor, capital funds for the construction of the Project are split between the United States government, the Commonwealth, Fairfax County, Loudoun County, and the Authority.  Nearly half of those funds are paid by the Authority.  None of the funds come from the Washington Metropolitan Area Transit Authority, which collects and retains Metrorail fares. Worse, Toll Road users are the most vulnerable because the amount they contribute to the Project is not capped.

58.     As Project costs have risen, so too has the share that comes from Toll Road users. In 2004, tolls were expected to cover about one quarter of the cost of the 23.1-mile rail line, but delays and cost overruns have pushed their share to nearly half of the Project's cost.

V.      **CLASS ACTION ALLEGATIONS**

59.     Plaintiff brings this lawsuit as a class action under Fed. R. Civ. P. 23 on behalf of himself and on behalf of a class of all other persons who, within the applicable limitations period, paid tolls for use of the Toll Road.  Excluded from the class are the Authority's officers, agents, servants, employees, and attorneys.

60.     The class includes all persons who paid tolls for use of the Toll Road by means of a transponder or similar device mounted in their vehicles as part of the "E-ZPass," "Smart Tag," or equivalent systems.  Transponder transactions are expected to account for approximately 88 percent of Toll Road revenue in 2018.  The identity of each class member using a transponder can be readily ascertained from computerized records maintained by the Authority, VDOT, and other governmental agencies in other states who issued transponders to each individual who electronically paid tolls on the Toll Road.  The records include the user's name, address, and amount(s) paid.

61.     The class also includes all persons who paid tolls for use of the Toll Road in cash. While records are not maintained that identify those class members, records of each toll transaction are maintained and the license plates of cars are photographed at toll booths. Accordingly, publication and other forms of notice can serve to bring this class action to the attention of class members who used cash, and the Authority's records can confirm any claims made by them.

62.     There are common questions of law and fact common to the members of the class and the class members' claims are typical of plaintiff's claims.  The class claims depend on a common contention – that a portion of the tolls are unlawfully established, charged, and collected to recoup costs not reasonably attributable to the Toll Road's use – and that common

contention is of such a nature that it is capable of classwide resolution, *viz.*, its truth or falsity will resolve issue that is central to validity of the § 1983 claim in one stroke.  Plaintiff is a member of the class and possesses the same interest and suffered the same injury as the class members.  Only the computation of the class members' individual damages will differ, but such computations can be readily made across the entire class.

63.     The class is sufficiently numerous and geographically dispersed to make joinder impracticable.  The class is composed of tens of thousands, if not hundreds of thousands, of Toll Road users.

64.     Plaintiff will fairly and adequately protect the interests of the class, and will have no interests that are contrary to, or in conflict with, class members.  Plaintiff has retained competent counsel experienced in class action and constitutional litigation.  Plaintiff will vigorously prosecute this litigation.

65.     Certification under Fed. R. Civ. P. 23(b)(3) is appropriate.  Common questions of law and fact not only exist, they predominate over questions affecting only individual class members.  Among the common questions of law and fact predominating across the class are:

      a.     Whether there is a federal constitutional right to intrastate travel;

      b.     Whether there is a federal constitutional right not to be charged tolls for the enjoyment of a federal constitutional right to intrastate travel except as necessary to recoup the costs reasonably attributable to tollpayers' use of the Toll Road;

      c.     Whether tolls charged are based on a fair approximation of tollpayers' use of the Toll Road;

      d.     Whether the Authority established, charged, and collected tolls on the Toll Road at unconstitutional levels and amounts during the class period;

      e.     Whether the Authority is a person acting under color of state law;

      f.     The appropriate formulation and measure of damages; and

g.    The propriety of declaratory relief.

66.    Other than the computation of individual damages, there are no known material questions of law or fact unique to the validity or invalidity of any class member's claim.

67.    A class action is superior to other available methods for the fair and efficient adjudication of this lawsuit because individual litigation of the claims of the class members is economically infeasible and procedurally impracticable.   While the aggregate amount paid by class members is likely to be in the tens of millions of dollars, the amount paid by each member of the classes is, as a general matter, too small to warrant the expense of individual lawsuits.   The likelihood of individual members of the class prosecuting separate claims is remote and, even if every class member could afford individual litigation, the court systems would be unduly burdened by such individual litigation.   Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments on the issues raised.   And multiple trials of the same factual issues would magnify the delay and expense to all parties and to the court system in reaching a definitive resolution of those issues.

## VI.    CLAIM FOR RELIEF – VIOLATION OF 42 U.S.C. § 1983

68.    Plaintiff incorporates the allegations of the preceding paragraphs as if fully alleged herein.

69.    This case comes down to one simple fact: When motorists pay tolls as they enter and exit the Dulles Toll Road, they are paying to travel across that highway, not to ride on the Metrorail.   But the Authority charges them for both, while neither actual Metrorail passengers nor Access Highway motorists are charged anything.   The central question for this Court to decide is whether the charging of highway tolls purposefully inflated to pay for the Metrorail's expansion violates the federal constitutional right to intrastate travel.   It does.

70.     The Authority is acting under color of state law.   Among other things, the Authority has established, charged, and collected tolls on the Toll Road pursuant to the Permit granted by VDOT.   The Permit confers authority that was formerly the Commonwealth's exclusive prerogative.   VDOT also has significantly and overtly encouraged the Authority to act, including by creating the legal framework necessary to carry out toll servicing on the Toll Road. In short, the Authority's "conduct has sufficiently received the imprimatur of the State so as to make it 'state' action for purposes of the Fourteenth Amendment." *Blum v. Yaretsky*, 457 U.S. 991, 1003 (1982); *see also Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725 (1961) (finding state action when a privately-owned restaurant located in a state-owned parking garage engaged in racial discrimination; although the decision to discriminate was made by the restaurant owner, a private concern, the state could have affirmatively required the restaurant not to discriminate as a condition to renting space in the parking garage).

71.     Furthermore, by establishing, charging, and collecting tolls in the manner and amount that it has, the Authority has deprived plaintiff and the class members of rights, privileges, or immunities secured by the United States Constitution.

72.     Although the Supreme Court has not yet expressly recognized a constitutional right to intrastate travel, language in multiple Supreme Court cases can be fairly viewed as supporting the existence of such a right.   *See, e.g.*, *Kent v. Dulles*, 357 U.S. 116, 126 (1958) ("Freedom of movement across frontiers in either direction, and inside frontiers as well, was a part of our heritage.   Travel abroad, like travel within the country, may be necessary for a livelihood.   It may be as close to the heart of the individual as the choice of what he eats, or wears, or reads.   Freedom of movement is basic in our scheme of values.").

73.     The Supreme Court's cases "have firmly established that the right of interstate travel is constitutionally protected." *Griffin v. Breckenridge*, 403 U.S. 88, 105 (1971).  It would be meaningless to describe the constitutional right to travel *between* states as a fundamental precept of personal liberty and not to acknowledge a correlative constitutional right to travel *within* a state.  *See Bell v. Maryland*, 378 U.S. 26, 255 (1964) (Douglas, J., concurring) ("The right of any person to travel *interstate* irrespective of race, creed, or color is protected by the Constitution.  Certainly his right to travel *intrastate* is as basic.") (emphases in original).

74.     In addition to recognizing a constitutional right to interstate travel, a plurality of the Supreme Court has recognized that "the freedom to loiter for innocent purposes is part of the 'liberty' protected by the Due Process Clause of the Fourteenth Amendment."  *City of Chicago v. Morales*, 527 U.S. 41, 53 (1999) (plurality opinion).  It would be meaningless to describe the constitutional right to *loiter* within a state as a fundamental precept of personal liberty and not to acknowledge a correlative constitutional right to *travel* within a state.

75.     Unsurprisingly, most state and lower federal courts to have addressed the issue have concluded that there is indeed a fundamental constitutional right to intrastate travel enshrined in the Fifth and Fourteenth Amendments to the United States Constitution.

76.     At the same time, citizens may not be subjected to "a charge for the enjoyment of a right granted by the federal constitution," *Murdock*, 319 U.S. at 113, except as necessary to "meet the expense incident to the administration of the act and to the maintenance of public order in the matter licensed."  *Cox*, 312 U.S. at 577.  "'Constitutional rights would be of little value if they could be indirectly denied,'" *Harman v. Forssenius*, 380 U.S. 528, 542 (1965) (quoting *Smith v. Allwright*, 321 U.S. 649, 664 (1944), "or 'manipulated out of existence.'"  *Id.* (quoting *Gomillion v. Lightfoot*, 364 U.S. 339, 345 (1960)).  Public bodies thus may not single out

constitutionally protected conduct for fees used, in whole or in part, to fund programs that are "unrelated to the scope of the activities" of those who pay the fees. *Murdock*, 319 U.S. at 113. Charges imposed for the enjoyment of constitutional rights must instead only be "imposed as a regulatory measure to defray the expenses of policing the activities in question." *Id.* at 114.

77.     These principles apply equally in the context of the right to travel. Ordinarily, "a charge designed only to make the user of state-provided facilities pay a reasonable fee to help defray the costs of their construction and maintenance may constitutionally be imposed on interstate and domestic users alike," *Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.*, 405 U.S. 707, 714 (1972), but a fee will violate the right to travel if it is not "based on some fair approximation of use or privilege for use" of the facilities *or* is "excessive in comparison with the governmental benefit conferred." *Id.* at 716-17; *see also Ingels v. Morf*, 300 U.S. 290, 296-97 (1937) (striking down as "an unconstitutional burden on interstate commerce" a statute imposing a $15 fee "intended to reimburse the state treasury for the added expense of administering the Caravan Act and policing the caravaning traffic" where "the cost of policing would be amply met by a license fee of one-third of the amount so charged").

78.     In establishing, charging, and collecting tolls for the specific purpose of financing the Project, and not merely recouping the costs reasonably attributable to tollpayers' use of the Toll Road, the Authority has unconstitutionally converted the exercise of the fundamental constitutional right to intrastate travel into a general revenue-raising measure – an impermissible levy on travel untethered to the costs generated by, or incident to, that activity. Tolls are established with only limited regard to whether the Authority actually provides public facilities used by tollpayers. They are not established to compensate for the benefit conferred. As one Virginia state senator was recently quoted in the Washington Post: "Users of the toll road are

people who do not take the Silver Line.  They don't use it and they don't get any benefit from it, yet they are the people who pay to make it go."

79.     Equally important, tolls are not fairly approximated with Toll Road users' share of the costs because, among other things, the Metrorail expansion is of primary benefit to others (*viz.*, Metrorail passengers) who bear *none* of the costs of that expansion.  *Cf. Nw. Airlines, Inc. v. County of Kent*, 510 U.S. 355, 369 (1994)(finding that government-owned airport's "allocation of the costs of air operations to the Airlines and general aviation, but not to the concessions" was a fair approximation of use of the airport facilities because "[o]nly the Airlines and general aviation actually use the runways and navigational facilities of the Airport; the concessions use only the terminal facilities").  Likewise, Access Highway motorists also bear *none* of the costs of the Metrorail expansion, although the Access Highway runs parallel to both the Toll Road and the Metrorail.

80.     It does not matter that "the Metrorail expansion and the Dulles Toll Road are parts of a single interdependent transit project."  *Corr v. Washington Metro. Airports Auth.*, 740 F.3d 295, 302 (4th Cir. 2014).  The relevant question in this lawsuit is not whether the Metrorail expansion has a meaningful functional relationship with the Toll Road, whether it benefits the general public, or even whether it indirectly benefits Toll Road users, but whether the Authority's financial obligations for the Project should be loaded *entirely* onto Toll Road users. To pass constitutional muster, tolls cannot be based upon the Project's overall costs, but upon the share of costs fairly attributable to tollpayers.  Because no costs of the Metrorail expansion can be fairly attributed to tollpayers' use of the Toll Road and because, conversely, no costs of the Metrorail expansion are paid for by Metrorail passengers or Access Highway motorists, the tolls are, *ipso facto*, not a fair approximation of use.

81.     Plaintiff does not contend that the Authority must adopt a formula that results in a one-to-one relationship between motorists' actual use of the Toll Road and the cost of providing that use to motorists.   There is no rational relationship, however, between the methodology the Authority has used to establish the tolls and the benefits that are available to those who pay them. There is no evidence that the Authority establishes tolls based on any method meant to even roughly approximate motorists' use of the Toll Road.   Tolls have instead been established according to a method which ensures that the toll revenues will cover the Metrorail's expansion.

82.     As a direct and proximate result of the Authority's unconstitutional conduct, plaintiff and the members of the class have been financially injured.

## VII.   PRAYER FOR RELIEF

83.     Wherefore, plaintiff, for himself and in his capacity as a representative of the members of the class, respectfully requests the following relief:

a.     That the Court certify this lawsuit as a class action under Fed. R. Civ. P. 23(a) and (b)(3);

b.     That the Court appoint plaintiff and his undersigned attorneys as class representatives and class counsel, respectively;

c.     That the Court award damages sustained by plaintiff and the members of the class in an amount to be proved at trial;

d.     That the Court issue a judgment declaring that the Authority's conduct violates the United States Constitution and 42 U.S.C. § 1983;

e.     That the Court award attorneys' fees to plaintiff and the members of the class as provided by 42 U.S.C. § 1988(b), together with costs of suit and pre- and post-judgment interest at the rate permitted by law; and

f.     That the Court award such other relief as this Court may deem proper.

## VIII.   JURY TRIAL DEMAND

84.     Plaintiff demands a trial by jury on all issues so triable.

Dated:  July 9, 2018

Respectfully submitted,

CARLTON FIELDS JORDEN BURT, P.A.

By: */s/ Brian P. Perryman*
Eugene J. Rossi (VSB No. 93136)
Brian P. Perryman (VSB No. 66691)
W. Glenn Merten (VSB No. 45655)
Gail E. Jankowski (VSB No. 90807)
1025 Thomas Jefferson Street, NW
Suite 400 West
Washington, DC 20007
Telephone: (202) 965-8100
Facsimile: (202) 965-8104
Email: grossi@carltonfields.com
Email: bperryman@carltonfields.com
Email: gmerten@carltonfields.com
Email: gjankowski@carltonfields.com

*Attorneys for Plaintiff Mark Schneider*

**CERTIFICATE OF SERVICE**

I certify that on July 9, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to counsel of record for all parties.

/s/ Brian P. Perryman
Brian P. Perryman (VSB No. 66691)